# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

JUVENTINO ESPINOZA,
Defendant and Appellant.

S269647

Fifth Appellate District
F079209

Tulare County Superior Court
VCF109133

January 26, 2023

Justice Liu authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Kruger, Groban, Jenkins, and Cantil-Sakauye[*] concurred.

---

[*] Retired Chief Justice of California, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. ESPINOZA

S269647


Opinion of the Court by Liu, J.


Penal Code section 1473.7 allows noncitizens who have served their sentences to vacate a conviction if they can establish by a preponderance of the evidence that their conviction is "legally invalid due to prejudicial error damaging [their] ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence." (Pen. Code, § 1473.7, subd. (a)(1); *id.*, subd. (e)(1); all undesignated statutory references are to this code.) To establish prejudicial error, a defendant must demonstrate a "reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences" (*People v. Vivar* (2021) 11 Cal.5th 510, 529 (*Vivar*)) and must corroborate any assertions with " ' "objective evidence" ' " (*id.* at p. 530). We note that a motion to vacate a conviction, in contrast to a direct appellate challenge to the plea itself, is generally filed, as here, after "the individual filing the motion is no longer in criminal custody." (§ 1473.7, subd. (b)(1).)

Defendant Juventino Espinoza accepted a plea bargain in 2004 and served one year in jail. He argues that he first learned that the plea put him at risk of losing his permanent resident status and being deported in 2015, when he was detained by federal immigration authorities at the airport after a return flight to the United States. He then sought to vacate his conviction three separate times. He asserts counsel never

1

informed him of the immigration consequences of his plea and that he would not have accepted the terms of the plea bargain if he had been so informed. In support of his third motion, before us now, Espinoza attached a declaration describing his biographical history, which includes more than 20 years living in the United States prior to conviction; a declaration from an immigration attorney explaining that Espinoza's convictions place him in danger of losing his permanent residence, being deported, and being barred from reentering the United States, and that there were immigration-safe alternatives his counsel could have pursued; and 30 letters from family, friends, community members, clients, and employers documenting his family ties, community connections, and work history. The trial court denied his motion, as it had his previous two. The Court of Appeal affirmed, concluding that Espinoza had not adequately corroborated his claim that immigration consequences were a paramount concern at the time of his plea.

We granted review to consider what constitutes a sufficient showing of prejudicial error within the meaning of section 1473.7. We limited the issue before us to the following: "Did the Court of Appeal err in ruling that defendant failed to adequately corroborate his claim that immigration consequences were a paramount concern and thus that he could not demonstrate prejudice within the meaning of Penal Code section 1473.7?" We hold that Espinoza has made the requisite showing and accordingly reverse the judgment of the Court of Appeal.

## I.

Espinoza migrated from Mexico to Northern California in 1981, when he was 13 years old. After arriving in Oroville, he

earned wages as a farmworker to support his parents and siblings. In 1986, when Espinoza turned 18, he became a lawful permanent resident. When Espinoza was 22 years old, he married Sandra Rose. The couple had six children together. Espinoza's wife and children are United States citizens and have resided in California for their entire lives. Espinoza's elderly parents, eight siblings, grandchildren, and sons-in-law also live in the United States and are either United States citizens or lawful permanent residents. Espinoza has now lived in the United States for over four decades.

Espinoza and his wife created a family and a home together in California. The couple bought a home in Cutler, where they raised their children. Their first-born child, Juventino Espinoza, Jr., graduated from Sierra Nevada College with a bachelor's degree in psychology and has plans to join the army to serve as a behavioral therapist for struggling soldiers. Their eldest daughter, Marisol Espinoza, graduated from Milan Institute in Fresno as a beautician. Their second daughter attended La Sierra Military Academy. One of their sons, Juan Carlos Espinoza, died a few months after birth.

Espinoza is the primary caregiver to his parents, who suffer from Parkinson's disease and diabetes. Espinoza's parents live with him in Cutler and rely on him for assistance with their daily activities, including cooking, shopping, doing laundry, administering medication, and driving to medical appointments.

Espinoza is the main financial provider for his family. After several years as a farmworker, Espinoza relocated with his wife in 1991 to the Central Valley, where he worked for Schellenberg Farms in Reedley as a farm manager. Beginning

in 1994, Espinoza worked for eight years as a supervisor at Abe-El Produce in Orosi before starting his own business.

In 2003, Espinoza and several others were arrested following an investigation into suspected methamphetamine manufacturing. During the proceedings, it was undisputed that Espinoza had no prior criminal history. Eventually, Espinoza pleaded no contest to conspiracy (§ 182, subd. (a)(1)), felony child abuse (§ 273a, subd. (a)), controlling property to manufacture a controlled substance (Health & Saf. Code, § 11366.5, subd. (a)), and possession of a controlled substance (*id.*, § 11350, subd. (a)).

At the time, Espinoza did not speak English; his attorney used a Spanish-speaking assistant to communicate with him before his plea. The assistant told Espinoza to plead no contest and "everything was going to be fine." Espinoza never discussed the immigration consequences of the plea with his attorney, who did not advise him that pleading to these charges would put him in danger of losing his permanent resident status, being deported, and being barred from reentering the United States. It appears he relied on the reassurance of his attorney's assistant that, if he pleaded no contest, "everything was going to be fine."

When Espinoza's plea was taken, the court provided him with the following advisement, pursuant to section 1016.5: "If you are not a citizen, you are hereby advised that conviction of the offense for which you have been charged may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States." Espinoza explained in his declaration: "I took the warning to be a general one that the court had to give

everyone who pleads guilty. I did not understand it to have applied to me as a legal permanent resident who was in the United States legally, my attorney at the time did not mention to me that my plea would have immigration consequences." It appears the court made no further inquiry into Espinoza's understanding or offer to answer any questions he might have had. He asserts that if he had known, he would not have accepted the plea and would instead have taken the case to trial or agreed to a longer sentence in exchange for an immigration-safe plea.

Following Espinoza's plea, he was placed on five years of probation and ordered to serve 365 days in jail. According to Espinoza, he was not informed by his attorney that his plea agreement included jail time. Nevertheless, he served the jail term called for by the plea bargain. Upon release, Espinoza returned to being the family's main financial provider. He started his own lawn services and gardening business. He was well-known and involved in the community. He volunteered, went to church, and took part in numerous community organizations. His wife, five children, two sons-in-law, several grandchildren, and his parents and siblings continue to reside in the United States.

In 2015, more than a decade after his convictions and the service of his jail term, Espinoza left the country for a trip. When he returned to the United States, he was questioned by immigration officials, and they seized his permanent residence card. He asserts it was during that encounter that he became aware of the immigration consequences of his plea.

In 2017, Espinoza filed a nonstatutory motion to vacate his conviction. He filed additional motions under section 1473.7

in 2018 and 2019. In each motion, Espinoza maintained that he had not been aware of the immigration consequences of his plea and that had he been aware, he would have sought a plea with lesser immigration consequences or taken his case to trial. The trial court denied all three motions, each time without an evidentiary hearing. Espinoza appealed the third denial, and the Court of Appeal affirmed. We granted review.

## II.

To prevail under section 1473.7, a defendant must demonstrate that his conviction is "legally invalid due to prejudicial error damaging [his or her] ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence." (§ 1473.7, subd. (a)(1).) The defendant must first show that he did not meaningfully understand the immigration consequences of his plea. Next, the defendant must show that his misunderstanding constituted prejudicial error. "[P]rejudical error . . . means demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences." (*Vivar*, *supra*, 11 Cal.5th at p. 529.)

We apply independent review to evaluate whether a defendant has demonstrated a reasonable probability that he would have rejected the plea offer had he understood its immigration consequences. (*Vivar*, *supra*, 11 Cal.5th at p. 527.) " '[U]nder independent review, an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law.' " (*Ibid.*) When courts engage in independent review, they must give deference to the trial court's factual determinations if they are based on " ' "the credibility of

witnesses the [superior court] heard and observed." ' " (*Ibid*.) But when the trial court's findings "derive entirely from written declarations and other documents," the trial court and the reviewing court " 'are in the same position,' " and no deference is owed. (*Id.* at p. 528.) Because the trial court here conducted no evidentiary hearing, there is no basis for deference, and "it is for the appellate court to decide, based on its independent judgment, whether the facts establish prejudice under section 1473.7." (*Ibid*.)

The record establishes that Espinoza did not meaningfully understand the immigration consequences of his plea. Although the trial court provided a general advisement under section 1016.5 that his conviction may have immigration consequences, Espinoza's attorney never advised him that pleading no contest to the charges at issue would result in his deportation. After his conviction, rather than living in hiding, Espinoza started his own business, joined community organizations, and became well-known in his local community. Moreover, he took an international commercial flight to the United States, which predictably required subjecting himself to the scrutiny of United States immigration officials, which is not consistent with the behavior of a person who understood that his convictions effectively ended his lawful resident status. (See *People v. Alatorre* (2021) 70 Cal.App.5th 747, 770 ["It goes without saying that someone who understood his criminal conviction made him automatically deportable would not voluntarily contact immigration authorities and advise them of his presence in the country."].) The remaining question is whether Espinoza established prejudicial error.

To determine whether there is a reasonable probability a defendant would have rejected a plea offer if he had understood

its immigration consequences, courts must "consider the totality of the circumstances." (*Vivar, supra*, 11 Cal.5th at p. 529.) "Factors particularly relevant to this inquiry include the defendant's ties to the United States, the importance the defendant placed on avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible." (*Id.* at pp. 529–530, citing *Lee v. United States* (2017) 582 U.S. __, __–__ [137 S.Ct. 1958, 1967–1969] (*Lee*); see *People v. Mejia* (2019) 36 Cal.App.5th 859, 872–873 (*Mejia*).) Also relevant are the defendant's probability of obtaining a more favorable outcome if he had rejected the plea, as well as the difference between the bargained-for term and the likely term if he were convicted at trial. (See *People v. Martinez* (2013) 57 Cal.4th 555, 564 (*Martinez*).) These factors are not exhaustive, and no single type of evidence is a prerequisite to relief.

A defendant must provide " 'objective evidence' " to corroborate factual assertions. (*Vivar, supra*, 11 Cal.5th at p. 530.) Objective evidence includes facts provided by declarations, contemporaneous documentation of the defendant's immigration concerns or interactions with counsel, and evidence of the charges the defendant faced. (See *Vivar, supra*, 11 Cal.5th at pp. 530–531; *Lee, supra*, 582 U.S. at p. __ [137 S.Ct. at p. 1961].)

Espinoza supported his section 1473.7 claim with evidence regarding his biographical history and ties to the United States; his lack of a criminal record; his community involvement following his conviction; and a declaration from an immigration law expert explaining that he could have pleaded to alternative, immigration-safe dispositions. In the proceedings below, the

district attorney and the Attorney General opposed Espinoza's motions to vacate his convictions. The Attorney General has since reversed his position and now agrees that Espinoza's evidentiary showing establishes prejudicial error within the meaning of section 1473.7. Applying our independent judgment, we weigh all relevant circumstances, with no single factor being dispositive in our consideration of the totality, and reach the same conclusion.

**A.**

Ties to the United States are an important factor in evaluating prejudicial error under section 1473.7 because they shed light on a defendant's immigration priorities. (*Vivar*, *supra*, 11 Cal. 5th at p. 530.) "[W]hen long-standing noncitizen residents of this country are accused of committing a crime, the most devastating consequence may not be a prison sentence, but their removal and exclusion from the United States." (*Id.* at p. 516.) Depending on the strength of a defendant's community ties, "the prospect of deportation" may be " 'an integral part' " or " 'the most important part' " of the defendant's "calculus in responding to certain criminal charges." (*Ibid.*) Community ties may be established by length of residence; immigration status; lack of connection to the country of origin; connections to family, friends, or the community; work history or financial ties; or other forms of attachment. (*Id.* at p. 530; see *People v. Rodriguez* (2021) 68 Cal.App.5th 301, 324–325 (*Rodriguez*); *People v. Lopez* (2021) 66 Cal.App.5th 561, 581 (*Lopez*); *People v. Soto* (2022) 79 Cal.App.5th 602, 610 (*Soto*).)

Objective evidence of a defendant's community ties includes facts provided by a defendant's declaration or declarations from family members, friends, colleagues,

community members, or other acquaintances. (*Vivar*, *supra*, 11 Cal. 5th at p. 530; see *Lopez*, *supra*, 66 Cal.App.5th at p. 581; *People v. Ogunmowo* (2018) 23 Cal.App.5th 67, 73; *Soto*, *supra*, 79 Cal.App.5th at p. 610; *Rodriguez*, *supra*, 68 Cal.App.5th at pp. 324–325.) The Court of Appeal erred by disregarding Espinoza's declaration on the basis that it did not constitute objective evidence. We made clear in *Vivar* that a defendant's declaration is one form of objective evidence relevant to a prejudicial error inquiry. (*Vivar*, *supra*, 11 Cal.5th at p. 530.)

In *Vivar*, we held that a defendant's substantial ties to the United States were an important factor in support of granting relief. Vivar "was brought to this country at age six . . . , and he attended schools, formed a family, and remained here for 40 years." (*Vivar*, *supra*, 11 Cal.5th at p. 530.) "At the time of his plea, he had two children, two grandchildren, and a wife, all of whom are citizens and all of whom resided in California. . . . Vivar had virtually no ties to Mexico, spoke Spanish 'like an American,' and found it 'difficult to function in Mexican society because people treat [him] like an outsider.' " (*Ibid.*) We concluded that these facts provided objective evidence of "Vivar's concern about the immigration consequences of his plea options," supporting a finding of prejudicial error. (*Ibid.*)

Similarly, the Courts of Appeal have found a defendant's strong community ties to provide compelling evidence in support of a finding of prejudicial error. (See *People v. Lopez* (2022) 83 Cal.App.5th 698, 708 [prejudice established where the defendant moved to the United States at the age of 13, his entire family lived here, and he lacked meaningful ties to his country of origin]; *Mejia*, *supra*, 36 Cal.App.5th at p. 872 [compelling evidence of prejudice where the defendant lived in the United States since he was 14 years old, and his wife and child lived

here, as well as his mother and siblings]; see also *People v. Camacho* (2019) 32 Cal.App.5th 998, 1011; *Soto, supra,* 79 Cal.App.5th at p. 610.)

The facts here are no less compelling. Espinoza has spent most of his life in the United States. He came to California when he was 13 years old. At the time of the plea, Espinoza had lived in California for 23 years. His wife and five children were United States citizens. His parents and siblings lived in the United States. He was the financial provider for his family. As Espinoza puts it, "[e]verything important in his life" at the time he entered his plea "was in the United States." (Cf. *People v. Superior Court* (*Zamudio*) (2000) 23 Cal.4th 183, 209 ["a deported alien who cannot return 'loses his job, his friends, his home, and maybe even his children' "].) Espinoza's deep and long-standing ties are undisputed and weigh in favor of finding that he would have considered immigration consequences to be of paramount concern in deciding whether to accept a plea agreement.

After Espinoza accepted the plea and served jail time, he returned home to care for his family and community. He became the caregiver for his elderly parents who suffer from severe medical conditions. He ran his own business to provide for his family. He volunteered, went to church, and took part in numerous community organizations. These facts lend credence to Espinoza's assertion that his community ties were important to him at the time of his plea.

Espinoza's case is unlike instances where courts have found insufficient community ties to support a finding of prejudicial error. In *People v. Bravo* (2021) 69 Cal.App.5th 1063, 1077, for example, the Court of Appeal concluded that a

defendant's connection to the United States was too tenuous to support an inference that he might not have knowingly accepted a plea deal with immigration consequences. The defendant, Bravo, moved to the United States at age 18. (*Id.* at p. 1076.) At the time of his plea, he had lived here for four and a half years. (*Ibid.*) Although Bravo had a girlfriend and a baby in the United States, the court found those relationships insufficient to establish a probability that Bravo would have rejected his plea deal. (*Id.* at pp. 1075–1076.) "[T]he offenses making [Bravo] a candidate for mandatory deportation were domestic violence and child cruelty against [his girlfriend and baby, respectively]," which undermined the argument that Bravo would have rejected his plea offer based on those relationships. (*Id.* at p. 1076; see *People v. Abdelsalam* (2022) 73 Cal.App.5th 654, 665 [finding no prejudice where defendant "had just arrived" in the United States].)

In sum, a defendant's deep and long-standing ties to the United States are among the totality of circumstances that can support an inference that immigration consequences were of paramount concern at the time of the defendant's guilty plea. Espinoza has demonstrated his ties to the United States, and those ties weigh in favor of a finding of prejudicial error.

## B.

Another consideration is whether alternative, immigration-safe dispositions were available at the time of the defendant's plea. Factors relevant to this inquiry include the defendant's criminal record, the strength of the prosecution's case, the seriousness of the charges or whether the crimes involved sophistication, the district attorney's charging policies with respect to immigration consequences, and the existence of

comparable offenses without immigration consequences. (See *Rodriguez, supra,* 68 Cal.App.5th at p. 325; *Mejia, supra,* 36 Cal.App.5th at p. 873; *Martinez, supra,* 57 Cal.4th at p. 564.) These matters can be placed in the record by either party.

Espinoza had no prior criminal history at the time of his plea. This fact is relevant because a defendant without an extensive criminal record may persuasively contend that the prosecutor might have been willing to offer an alternative plea without immigration consequences. (See *Rodriguez, supra,* 68 Cal.App.5th at p. 325 ["The record does not indicate that in 2005 Rodriguez extensively trafficked in methamphetamine or had such a serious criminal record that the prosecution would necessarily have been unwilling to enter an immigration-neutral plea."].)

Additionally, Espinoza presented evidence from an immigration attorney that there were alternatives the prosecution could have offered that would not have resulted in mandatory deportation. Espinoza pleaded no contest to conspiracy (§ 182, subd. (a)(1)), felony child abuse (§ 273a, subd. (a)), controlling property to manufacture methamphetamine (Health & Saf. Code, § 11366.5) and to possessing cocaine (*id.,* § 11350). The immigration attorney's declaration identified alternative offenses without deportation consequences to which Espinoza might have been able to plead.

The Court of Appeal said "[w]e need not pass upon the practical likelihood" that Espinoza could have bargained for an immigration-safe plea because "the focus is on whether Espinoza would have pursued such an alternative resolution notwithstanding its viability." (*People v. Espinoza* (May 28, 2021, F079209) [nonpub. opn.] (*Espinoza*).) While it is true that

the key question under section 1473.7 is " 'what the defendant would have done' " (*Vivar, supra,* 11 Cal.5th at p. 528), a relevant consideration is the probability of obtaining a more favorable outcome (*Martinez, supra,* 57 Cal.4th at p. 564), and that inquiry is informed by whether the defendant would have had reason "to expect or hope" that a plea deal without immigration consequences "would or could have been negotiated" (*id.* at p. 567). Espinoza's lack of a criminal record, combined with the declaration of the immigration attorney, support his assertion that he had reason to expect or hope for a plea bargain without immigration consequences. This enhances the "credibility of [the] defendant's claim" that he "would have rejected the plea bargain" had he been properly advised. (*Id.* at p. 568.)

## C.

In denying relief, the Court of Appeal observed that Espinoza did not express contemporaneous confusion, as Vivar did. (*Vivar, supra,* 11 Cal.5th at pp. 530–531.) But unlike Vivar, who was aware of the immigration consequences of his plea "at or near the time of his plea" (*id.* at p. 530), Espinoza has declared that he did not discover those consequences until more than a decade after his plea (*ante,* at p. 5). The Court of Appeal also questioned Espinoza's credibility because he did not submit evidence from his plea counsel, as Vivar did. (*Vivar,* at pp. 530–531.) But by the time Espinoza filed the motion at issue in this appeal, it had been 15 years since the plea. Both the district attorney and Espinoza's counsel represented to the court that they tried, without success, to contact the attorney who represented Espinoza at the time his plea was entered. As the Attorney General observes, "the robust evidence introduced in *Vivar* will not be available in most cases — especially where

defendants do not learn about the immigration consequences of their pleas until years or decades later."

*Vivar* did not suggest that the circumstances of that case constitute minimum requirements for establishing prejudicial error. A party seeking relief under section 1473.7 is not required to provide the declaration of plea counsel. (*People v. Manzanilla* (2022) 80 Cal.App.5th 891, 909.) Nor is a defendant required to submit contemporaneous documentation from the time of the plea. Rather, the inquiry under section 1473.7 requires consideration of the "totality of the circumstances," which necessarily involves case-by-case examination of the record (*Vivar*, *supra*, 11 Cal.5th at pp. 529–530), and no specific kind of evidence is a prerequisite to relief. As noted, the burden rests with the defendant to establish entitlement to relief. In addition to submitting declarations, both parties are entitled to request an evidentiary hearing. (§ 1473.7, subd. (d).) The more robust and inclusive a record, the greater the opportunity for effective persuasion and meaningful judicial review. And the inquiry into a defendant's state of mind may often involve the weighing of credibility and circumstantial evidence.

Having considered the totality of the circumstances here, we conclude that Espinoza has shown a reasonable probability that he would have rejected the plea and either gone to trial or sought a different, immigration-safe bargain if he had understood the consequences of the plea. Espinoza's deep and longstanding ties to the United States, along with those to his family and community, support the conclusion that immigration concerns would have been paramount to him at the time of his plea. (See *Vivar*, *supra*, 11 Cal.5th at pp. 516–517.) In addition, Espinoza's lack of criminal history at the time of his plea and the immigration attorney's declaration identifying alternative

immigration-safe dispositions suggest that he had reason to expect or hope for a different plea agreement without immigration consequences. (See *Martinez, supra,* 57 Cal.4th at p. 567; *Mejia, supra,* 36 Cal.App.5th at p. 873.)

We also find it significant that the Attorney General agrees Espinoza is entitled to relief. Although we are not required to accept this concession, it suggests that any remand for further development of the record will serve only to delay the relief to which both parties now agree Espinoza is entitled. While a remand for reconsideration and the development of the record may be advisable in other cases, we are satisfied that the evidence here establishes a reasonable probability that Espinoza would have rejected the plea if he had understood its immigration consequences.

## CONCLUSION

We reverse the judgment and remand the case to the Court of Appeal with directions to remand the case to the trial court for entry of an order granting Espinoza's section 1473.7 motion to vacate his conviction.

**LIU, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**CANTIL-SAKAUYE, J.**[*]

---

[*] Retired Chief Justice of California, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Espinoza

_____

<u>Procedural Posture</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)** XX NP opn. filed 5/28/21 – 5th Dist.
**Rehearing Granted**

_____

**Opinion No.** S269647
**Date Filed:** January 26, 2023

_____

**Court:**  Superior
**County:**  Tulare
**Judge:**  Steven D. Barnes

_____

**Counsel:**

Sanger Swysen & Dunkle, Stephen K. Dunkle and Sarah S. Sanger for Defendant and Appellant.

Gibson, Dunn & Crutcher, Kahn A. Scolnick, Daniel R. Adler, Emily R. Sauer, Patrick J. Fuster and Matt Aidan Getz for Alyssa Bell, Reuven Cohen, Ingrid V. Eagly, Gilbert Garcetti, Meline Mkrtichian, Ronald J. Nessim, Gabriel Pardo and Jennifer Resnik as Amici Curiae on behalf of Defendant and Appellant.

Stanford Law School Immigrants' Rights Clinic, Jayashri Srikantiah and Yulie Landan for Asian Americans Advancing Justice – Asian Law Caucus, Alameda County Public Defender's Office, American Civil Liberties Union Foundation of Southern California, American Civil Liberties Union of Northern California, California Collaborative for Immigrant Justice, Centro Legal de la Raza, Community Legal Services in East Palo Alto, Dolores Street Community Services, Dreamer Fund, Immigrant Alliance for Justice and Equity, Immigrant Legal Defense, Jewish Family & Community Services East Bay,

National Immigration Project of the National Lawyers Guild, Open Immigration Legal Services, Organization for the Legal Advancement of Raza, Public Counsel, San Francisco Office of the Public Defender, San Joaquin College of Law New American Legal Clinic, Santa Barbara County Immigrant Legal Defense Center, Silicon Valley De-Bug, Stand Together Contra Costa, Tahirih Justice Center, University of California Davis Immigration Law Clinic, University of California Irvine Criminal Justice Clinic and University of California Irvine Immigrant Rights Clinic as Amici Curiae on behalf of Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Michael J. Mongan, State Solicitor General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Samuel P. Siegel, Deputy State Solicitor General, Darren K. Indermill, David Andrew Eldredge and Kari Ricci Mueller, Deputy Attorneys General, and Kimberly M. Castle, Associate Deputy State Solicitor General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Stephen K. Dunkle
Sanger Swysen & Dunkle
222 East Carrillo Street, Suite 300
Santa Barbara, CA 93101
(805) 962-4887

Samuel P. Siegel
Deputy State Solicitor General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3917